2McCLENDON, J.
This appeal arises from an action for workers’ compensation that was denied. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
In July of 1999, Raymond G. Flick, a pest control technician, was working in the course and scope of his employment with Fischer Environmental Services, Inc. (hereinafter “Fischer”), spraying a house with pesticides when he was “doused” with the pesticides. Mr. Flick was not wearing any protective clothing or gear at the time of the incident. Mr. Flick claimed that as a result of this exposure, he began to experience headaches, stomach problems, dizziness, shortness of breath, insomnia, anxiety, and memory loss.
Although Mr. Flick was not paid workers’ compensation indemnity benefits by his employer, medical treatment was provided until May 2001, at which time all benefits were terminated.
On March 30, 2000, plaintiff filed a claim for workers’ compensation with the Office of Workers’ Compensation Administration (hereinafter “OWC”). A hearing was held before an OWC judge on December 10, 2001, and the matter was taken under advisement. Judgment was signed on January 9, 2002 by the OWC judge, denying plaintiffs claims. Plaintiff then appealed this judgment and on appeal asserts the following assignments of error:
(1) The [OWC] committed reversible error in its failure to consider the presumption that Appellant’s symptoms which manifested themselves immediately following the accident were presumed to be caused by the work accident.
(2) The [OWC] committed reversible error in its failure to find that the Appellant’s injuries were caused by the work accident and that as a result of those injuries that he was unable to 1 ¡¡perform the duties of his employment and entitled to payment for continuing treatment.
DISCUSSION AND ANALYSIS

Entitlement to Workers’ Compensation

An employee who receives personal injury by accident arising out of and in the course of his employment shall be paid compensation, if not otherwise eliminated from by the workers’ compensation provisions, by his employer in the amounts, on the conditions, and as designated by La. R.S. 28:1021 et seq. See La. R.S. 23:1031. “Accident” means “an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.” La. R.S. 23:1021(1).
The employee who claims a right to collect workers’ compensation benefits has the burden of proving a work-related accident by a preponderance of the evi *3 dence. Bolton v. B E & K Construction, 2001-0486, p. 8 (La.App. 1 Cir. 6/21/02), 822 So.2d 29, 35; Catchot v. RAMCO Construction, 2000-1922, pp. 2-3 (La.App. 1 Cir. 11/14/01), 818 So.2d 105, 107, citing Bruno v. Harbert International Inc., 593 So.2d 357, 361 (La.1992). Additionally, the employee bears the burden of establishing the casual connection between the disability and the employment accident by a reasonable preponderance of the evidence. Quinones v. United States Fidelity and Guaranty Company, 93-1648, p. 6 (La.1/14/94), 630 So.2d 1303, 1306-7.
In the instant case, the OWC judge found that Mr. Flick had sustained a work-related accident on July 22, 1999, but that he was not entitled to |4workers’ compensation benefits as a result. The written reasons of the OWC judge for this ruling were as follows:
Raymond Flick was allegedly injured on July 22, 1999. Mr. Flick was spraying a pesticide called Cyren when the hose on the sprayer came loose and he was sprayed in the neck and chest area. [Fischer] paid all related medical expenses until May 2001. Fischer did not pay any indemnity benefits to Mr. Flick.

Findings of Fact

Trial testimony and evidence introduced at trial corroborate the fact that Mr. Flick sustained an injury on July 22, 1999 when he was sprayed with a pesticide called Cyren. Records from Oehs-ner Clinic confirm he was seen on July 23, 1[999] by Dr. Guilbault and that he gave a history of being exposed to the pesticide the day before.
The question of whether Mr. Flick is now or has ever been disabled from working as a result of his exposure is more difficult to answer.
Mr. Flick bears the burden of proving that any disability he suffers from was caused by his accident. In the [instant] case, the court finds that the weight of the medical evidence indicated Mr. Flick was not disabled [from] working as a result of this accident.
Mr. Flick was referred to Dr. Joseph Tamimie shortly after the accident. Dr. Tamimie is the medical director of the occupational medical clinic at East Jefferson General Hospital. Dr. Tamimie testified in his deposition that he performed a battery of tests on Mr. Flick, all of which were normal. He further testified that in his opinion, Mr. Flick could return to work in pest control as long as he took appropriate precautions and used adequate respiratory and skin protection. This was in November of 1999. Additionally, in a January 11, 2000 report from Dr. Gerald Keller at Ochsner, Dr. Keller agreed that Mr. Flick could return to work, and reported that Mr. Flick himself felt he was ready to go back to work.
Mr. Flick began treating with Dr. Jeanette Lopez, his choice of neurologist, in December 2000. Mr. Flick treated with Dr. Lopez through May 2001. In her deposition testimony, Dr. Lopez stated that during the course of Mr. Flick’s treatment, she had never seen his prior medical records, nor had she been provided with any information on the chemicals to which Mr. Flick was allegedly exposed, Cyren and Dursban. Finally, Dr. Lopez testified that she could not “close the gap” between Mr. Flick’s symptoms and whether they were related to a toxic exposure. Since she had not seen a copy of Mr. Flick’s job description, she also could not comment on his ability to return to work except to the extent that he probably should not drive a commercial vehicle.

Conclusions of Law

Looking at the evidence as a whole, the court finds that Mr. Flick has failed *4 to establish a causal connection between a Istoxic exposure on July 22, 1999 and his current symptoms. As such, Fischer’s termination of medical benefits in May 2001 was not improper. Further, Mr. Flick has failed to prove he is disabled from working, and as such he is not entitled to indemnity benefits.
On appeal, the factual findings of an OWC judge are subject to the same standard of review as in other cases; i.e., a trial court’s finding of fact may not be set aside on appeal unless there is no reasonable factual basis for the finding and the finding is clearly wrong (manifestly erroneous). See Bolton v. B E & K Construction, 2001-0486 at p. 7, 822 So.2d at 35; McCray v. Delta Industries, Inc., 2000-1694, p. 4 (La.App. 1 Cir. 9/28/01), 809 So.2d 265, 269. See also Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). If the trier of fact’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Consequently, when there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Bolton v. B E & K Construction, 2001-0486 at p. 7, 822 So.2d at 35, citing Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1112 (La.1990).
At the trial of this matter, the plaintiff, Raymond Flick, testified that on the date in question, July 22, 1999, he was spraying wasp nests on the eaves of a house when the hose separated from its fittings, spraying the chemical into his face and neck area.[2] He immediately shut off the flow of chemicals from the truck, then used the home’s garden hose to rinse the chemicals from his person as best he could. Mr. Flick testified that the chemical he was using was “Sirin,” which he identified as being the same chemical as “dursaban.” Mr. Flick stated that he had five or six feet left to | ^finish on the job, so he “went ahead and finished the job off.” After-wards, Mr. Flick testified that he went to the office and reported the incident and asked to go home and take a bath. On the way home, Mr. Flick related that he began to feel as if he were coming down with the flu. After arriving home, he took a bath, ate his dinner, and went to bed.[3] Mr. Flick testified that in the middle of the night, he awakened from a nightmare, feeling as if he had to throw up. Upon getting out of bed, he fell onto the floor and then had to hold onto the walls to get to the bathroom. Mr. Flick related that he threw up numerous times during that night. The next day, Mr. Flick went to his primary care physician at Ochsner, who he stated was either Dr. Keller or Dr. Gil-beaux (sic), where he was prescribed medications.
Although Mr. Flick testified that he attempted to go back to work for about a month, he claims he was given old equipment to use and he was “every day getting dursaban (sic) down my hand, down my arm, trying to avoid it with gloves, trying to have my equipment fix[ed]” and that when he became ill again, his doctor told him not to go back to work.
After treating with his primary care physician for some time, Mr. Flick was *5 referred to Dr. Tamimie, an occupational medicine specialist,[4] and thereafter treated with various other physicians. At the time of trial, Mr. Flick testified that he was still under the care of Dr. Lopez, a neurologist.[5]
Mr. Flick described his symptoms to the court as consisting of pain in his head, forgetfulness, difficulty communicating, tenseness of his body, extreme nervousness, difficulty sleeping, and a tendency to veer to the right |7when walking or driving.[6] Mr. Flick denied having any difficulty working or having any of the symptoms that he complained of prior to the incident in question. Mr. Flick testified he wanted to work but that since his accident he tried to work at his wife’s place of work, distributing medicine to the elderly, and was unable to do so. Mr. Flick stated that he also tried working for the government as a census taker but was unable to keep up with the other workers. He further testified that he has difficulty doing housework at home as he either forgets what he is doing or becomes physically exhausted after a short while. Although Mr. Flick was unable to point to any document stating he was unable to work, Mr. Flick maintained that his treating physicians told him he was unable to work initially.
Cheryl Flick, plaintiffs wife of over twenty years, testified that prior to the accident, Mr. Flick had never had a history of headaches, migraines, or dizziness. Mrs. Flick testified that before the accident her husband was vibrant and energetic and that since the accident he suffers from constant headaches, nervousness, and lack of energy; she stated that his “thought patterns are not the same.”
Gary Williams, a workers’ compensation adjuster for Risk Management Services (hereinafter “RMS”) testified at trial that he had handled Mr. Flick’s claim since it was first filed in October of 1999. Mr. Williams testified that Mr. Flick’s medical bills continued to be paid, even though initial tests came back within normal limits, because of the complicated nature of the claim of chemical exposure and his intent to “exhaust all avenues before making [a] determination.” Payment of medical | ¡^benefits was terminated after the adjuster received a medical report indicating the plaintiffs symptoms were not related to the accident. No vocational rehabilitation was ever done on plaintiff, as apparently none was ever requested by plaintiff. Both Gary Williams and Mary Bart[7] testified that Mr. Flick did not request vocational rehabilitation.
Mr. Flick’s treating neurologist at the time of the trial of this matter was Dr. Jeanette Lopez, whose deposition was submitted into evidence. In her deposition, taken June 5, 2001, Dr. Lopez related that she began her treatment of Mr. Flick in *6 December of 2000 and last saw him on May 31, 2001, for a total of five or six visits. Although Dr. Lopez recounted the many symptoms complained of by plaintiff to her and her attempts to treat these symptoms with various medications, she was unable to say the symptoms were caused by toxic chemical exposure. Dr. Lopez admitted that she had knowledge of the exposure only through the history as related to her by plaintiff. Objective physical testing performed by Dr. Lopez did indicate some abnormal results, which Dr. Lopez stated were evidence of some vestibular dysfunction. However, Dr. Lopez admitted, when asked about whether plaintiffs symptoms were caused by toxic exposure, that she could not “close the gap.”
Dr. Susan R. Andrews, a neuropsychologist, performed a neuropsychological evaluation of Mr. Flick in April of 2001. Dr. Andrews found discrepancies in Mr. Flick’s intelligence test scores, which she opined were not likely to have existed pri- or to Mr. Flick’s chemical exposure. Dr. Andrews measured impairment of Mr. Flick’s: attention and concentration; speech sounds perception; smell perception; motor speed of dominant hand; |9 memory; and problem-solving ability. Dr. Andrews correlated these deficits with Mr. Flick’s reports of a significant exposure to an organophosphate pesticide.
Plaintiff was further evaluated by Dr. Srinivas S. Ganji, a neurologist. Dr. Ganji found no abnormalities in his neurological examination of plaintiff and attributed his symptoms to vascular headaches.
In June of 2001, plaintiff was evaluated by another neurologist, Dr. Mark A. Fer-rante. Dr. Ferrante found plaintiffs neurological examination virtually normal and also attributed plaintiffs symptoms to his headaches and/or anxiety.[8]
Plaintiff was also evaluated by clinical psychologist, Thomas J. Hannie, Jr. Dr. Hannie related that his testing of plaintiff revealed: a dysfunctional pain profile (below average pain profile with significant interference with life and affective distress); a great deal of exaggeration on the Minnesota Multiphasic Personality Inventory (noting extreme elevations on several scales that are suggestive of exaggeration or malingering of physical, cognitive, or psychological symptoms);[9] more than two standard deviations above “any clinical honest patient” on the “Structure Interview of Reported Symptoms” (findings were slightly above average for malingerers |inand fell within one response of meeting the cut off for feigning);[10] and *7 plaintiffs scores on the “Test of Memory Malingering” were far below expected even if he were experiencing cognitive impairment or traumatic brain injury and were well into the feigning range. In his conclusion, Dr. Hannie stated the following:
Mr. Flick was able to present a large number of symptoms that were consistent with poisoning by the chemical to which he was exposed. It should be noted, however, that he had read quite a bit about what is to be expected from such an occurrence, thus the similarity of his claimed symptoms to the results of the chemical should not be seen as evidence that he is in fact responding to that chemical. The significant difference, of course, is the fact that the clinical course has not been followed; he has continued to experience problems over a long period of time.
Dr. Hannie noted that plaintiff took literature about the chemical(s) in question with him on at least one doctor’s visit. Dr. Hannie concluded that based on his test results, “the symptoms Mr. Flick is claiming cannot be believed; he is simply claiming more symptoms and feigning more disability than exits.” Dr. Hannie further concluded, “It is my opinion that Mr. Flick is intentionally producing false or grossly exaggerated symptoms. The appropriate diagnosis is Malingering.”
After a thorough review of the evidence presented to the OWC, we find that there were two permissible views of the evidence; i.e., either plaintiff suffered extensive and long-term effects as a result of his July 1999 chemical exposure, which were disabling, or the results were limited and of such short duration as not to have been disabling. The OWC found the latter. Given the conflicting medical testimony and evidence, there was a reasonable factual basis in the record upon which the trier of fact could have In found that plaintiff was either exaggerating the extent of his symptoms and/or that those symptoms were caused by factors unrelated to the accident. When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, we are unable to say the finder of fact was manifestly erroneous in its decision to deny plaintiff further workers’ compensation benefits.
We find unpersuasive plaintiffs argument that the jurisprudential presumption enunciated in Quinones v. United States Fidelity and Guaranty Company should be applied to his case; i.e., since plaintiff was in good health prior to the accident and experienced symptoms following the accident, a reasonable possibility of causal connection between his disability and the accident is presumed. We note that said presumption of a causal relationship between the accident and an employee’s disability only applies where symptoms of a disabling condition appear after the accident and continuously manifest themselves afterward, providing there is sufficient medical evidence to show a reasonable possibility of a causal connection between the accident and a disabling condition. Quinones v. United States Fidelity and Guaranty Company, 93-1648, p. 7, 630 So.2d at 1307. In the instant case, the trier of fact rejected plaintiffs evidence that he continuously suffered from a disabling condition after the accident. Finding no manifest error in the factual determination, we consider Quinones v. United States Fidelity and Guaranty Company inapplicable to this case.
*8 | ^CONCLUSION
For the reasons assigned herein, the judgment of the Office of Workers’ Compensation is affirmed. All costs of this appeal are to be borne by plaintiff/appellant herein, Raymond G. Flick.
AFFIRMED.

. It is interesting to note that although plaintiff reported at trial that the pesticide exposure was to his face and neck, the Ochsner Clinic records from his visit there on the day following the exposure reflect that plaintiff reported that the pesticide "spilled ... on his left arm and chest.” No mention therein was made of exposure to plaintiff's neck or face.

. On cross-examination, Mr. Flick admitted that when he first arrived home from work on the day of the accident, he walked his dogs and took a dive into the river running behind his property before taking a shower in the house.

. Dr. Tamimie was, at the time of trial, Medical Director of the East Jefferson General Hospital Occupational Medicine Clinic, and was offered as an expert in the fields of occupational medicine and toxicology.

. Dr. Lopez was offered as an expert in the field of neurology.

. On cross-examination, Mr. Flick re-affirmed his prior answers to defense interrogatories that he also continues to suffer migraines, depression, muscle weakness, reduction in sex drive, inability to learn new tasks, difficulty making decisions, fatigue, confusion, shortness of breath, vision problems, joint and muscle pain, frustration, and tingling in his hands, feet, and head. Mr. Flick responded to defense questioning that all of his symptoms appeared in the first week after his accident, when he was unable to leave his bed because of nausea and vomiting.

.Mary Bart was the medical case manager for Magnolia Medical Management, engaged by RMS to assist in gathering medical information.

. Some neurological findings were made that were noted to be unrelated to plaintiff's current complaints; i.e., carpel tunnel syndrome, a right C6-C7 nerve root lesion, and an eight-millimeter, right-frontal, subcutaneous nodule.

. Dr. Hannie related the following additional details regarding this test:
Some distinctive problems are evident in his MMPI-2 profile. His profile pattern indicates an interest in portraying himself as being physically disabled. He reported extensive vague physical problems that are unlikely to be the result of a specific physical disorder. This is most likely the result of a long-term chronic pattern of somatization that stems from basic ingrained personality problems. He reports being unable to function effectively because of his physical symptoms, which appear to intensify when he faces life conflicts. Individuals with this clinical pattern tend to be uninsightful when it comes to understanding the causes of their symptoms, in part because they prefer to rely on medical explanations for their symptoms. Individuals with this pattern often obtain substantial secondary gain from their symptoms.

.Although Dr. Hannie stated that the results did not allow a clear call of feigning on the basis of this test alone, he opined the likelihood of feigning was above eighty percent, noting that only four of the eight test scales were in the honest range.